IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROY MITCHELL,

               Plaintiff,                        OPINION and ORDER

    v.

SHERIFF SERGEANT MR. PAT PRICE,                11-cv-260-wmc
SERGEANT MR. KOEHLER,
SHERIFF OFFICER TIMOTHY ALGIERS,
OFFICER MR. JAMES WILSON,
OFFICER MR. NATHAN JOHNSON and
OFFICER MR. DANIEL WERKHEISER,

               Defendants.

---

      Plaintiff Roy Mitchell was granted permission to proceed on claims that: (1) certain employees at the Dane County Jail violated her equal protection rights because of her transgender status; (2) defendant James Wilson used excessive force against her; and (3) defendant Carl Koehler defamed her by calling her a "hermaphrodite."[1]  The parties have completed briefing on defendants' motion for summary judgment, and Mitchell has submitted several other motions.  After considering the documents submitted by the parties, the court will grant defendants' motion for summary judgment on all of Mitchell's claims, except for her equal protection claim regarding defendant Koehler's decision to transfer her back to a housing pod in which she had previously been taunted and threatened.  Additionally, all of Mitchell's motions will be denied, except for her motion for the court's assistance in recruiting counsel.

---

[1] At Mitchell's request, the court will refer to her using female pronouns.

PRELIMINARY MATTERS

## I. Motions to Reinstate Defendants

In the court's January 20, 2012 screening order, defendants David Mahoney and Wisconsin Mutual Insurance Company ("WIMIC") were dismissed from the case because the complaint contained no allegations suggesting that they were personally involved in the violations of her rights.  Mitchell has filed motions to add both of these defendants back into the case.  (Dkts. #40, 56.)  In her "Motion for Reconsideration Reinstatement of Defendant Mr. David Mahoney," Mitchell asserts that Dane County Sheriff Mahoney was aware of the county jail staff's conduct and "turned a blind eye to it."  In support of this assertion, Mitchell attaches a copy of a February 9, 2011, email addressed to Mahoney from the executive assistant to the Dane County executive, which states that the county executive was forwarded a letter from Mitchell to then-Congresswoman Tammy Baldwin regarding Mitchell's mistreatment at the jail.

Setting aside the third-party hearsay and unsupported inferences, there is an even more fundamental problem with Mitchell's reliance on this email to prove that Mahoney was informed of jail staff's conduct toward her: by the time Mahoney received this email, Mitchell had long ago been transferred out of the Dane County Jail.  Indeed, Mitchell's financial statements show that she was transferred to the New Lisbon Correctional Institution no later than October 6, 2010.  Because Mitchell's own allegations contradict (or at least fail to support) an inference that Mahoney was personally aware of (much less personally involved in) the claimed misconduct at the jail, Mitchell's motion to reinstate Mahoney as a defendant will be denied.

As for WIMIC, Mitchell states that it is the defendants' insurer.  The court understands Mitchell to be saying that she should be allowed to include WIMIC as a defendant under the Wisconsin Direct Action Statute, which states as follows:

> Direct action against insurer.  Any bond or policy of insurance covering liability to others *for negligence* makes the insurer liable, up to the amounts stated in the bond or policy, to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured.

Wis. Stat. § 632.24 (emphasis added).  As an initial matter, Mitchell's *only* state law claim is for defamation, not negligence.  Even if § 632.24 applied to a defamation claim, WIMIC has no place in this lawsuit going forward.  As discussed further below, the court will be granting defendants' motion for summary judgment on the defamation claim.  Accordingly, the motion to reinstate WIMIC as a defendant has been rendered moot.

## II. Motion to Amend Complaint

Mitchell also filed a motion to amend the complaint to add claims for violations of the United Nations' Universal Declaration of Human Rights.  (Dkt. #81.)  However, this document is "simply a statement of principles and not a treaty or international agreement that would impose legal obligations."  *Konar v. Illinois*, 327 F. App'x 638, 640 (7th Cir. 2009) (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734 (2004)).  Since the Declaration creates no enforceable rights, Mitchell cannot bring claims under it, and her motion to amend the complaint will be denied.

## III. Motion for Sanctions

Mitchell has filed a motion to sanction defendants under Fed. R. Civ. P. 11 for submitting false responses in their answer. (Dkt. #115.)  When a litigant suspects that the opposing party has violated Rule 11, the litigant is required to give the opposing party formal notice of the conduct alleged to violate Rule 11 *and* offer the party an opportunity to withdraw or correct its actions to avoid imposition of sanctions.  Fed. R. Civ. P. 11(c)(1)(A); *Divane v. Krull Electric Co., Inc.*, 200 F.3d 1020, 1026 (7th Cir. 1999).  Mitchell does not aver that she did either.  Having provided no evidence that she satisfied the notice requirement of Rule 11(c)(1)(A), Mitchell's Rule 11 motion will also be denied.

## IV. Motion for Temporary Restraining Order

Mitchell has filed a motion for temporary restraining order (dkt. #141), which will be denied for two reasons.  First, she is no longer incarcerated at the Dane County Jail, so the motion is moot.  *See Lehn v.* Holmes, 364 F.3d 862, 871-72 (7th Cir. 2004) (discussing the "uncontroversial proposition that when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot").  Second, her motion fails to comply with this court's procedures to be followed on motions for injunctive relief.  Under these procedures, a plaintiff must file with the court and serve on defendants proposed findings of fact supporting her claim, along with any evidence she has to support those findings and her request for relief.   In her motion for TRO, Mitchell states that she is being discriminated against at the jail, but provides almost no detail about these events.  Nor does Mitchell explain whether the events discussed in her motion have any connection to the defendants or

her claims in this case (as stated above, years had passed between the events mentioned and the filing of her complaint, much of that time *after* she had been moved out of the jail itself). Accordingly, it is uncertain, at best, whether there is *any* need for the requested injunctive relief at this (or any) stage of the lawsuit.

## V.  Motion to Amend Request for Relief

Finally, Mitchell filed a motion to amend the portion of her complaint containing her request for relief to a larger amount to reflect "up-to-date retaliatory unethical imposed dehumanizative abuses." (Dkt. #149.)  Since Mitchell has neither sought nor been granted leave to amend her complaint to add claims for these new, alleged *abuses*, and no such leave is likely to be granted at this stage, these claims will remain outside this case, meaning she cannot amend the relief she requests to encompass them.[2]

---

[2] This is not the only defect in Mitchell's motion to amend.  For example, similar to the problems with her motion for a temporary restraining order, Mitchell does not describe these new abuses in any kind of detail, so the court cannot construe her motion as an attempt to supplement her complaint.

SUMMARY JUDGMENT

**I. Undisputed Facts[3]**

    **A. The Parties**

This lawsuit arises out of events that occurred while plaintiff Roy Mitchell was an inmate at the Dane County Jail, located in Madison, Wisconsin.[4]  At all times relevant to this lawsuit, defendants Pat Price, Carl Koehler, Timothy Algiers, James Wilson, Nathan Johnson and Daniel Werkheiser[5]  were employed at the Dane County Sheriff's Office.

Mitchell is biologically a male.  Mitchell lives as a "[t]ransgendered American" and describes herself as "a female trapped in a male's body."  Mitchell has always been housed in male facilities, and does not disagree with that practice because she was biologically born a male.

    **B. Transfers and Discipline**

On July 21, 2006, Mitchell was removed from administrative confinement and moved to the Public Safety Building.  The decision was made by defendant Price based on "Mental

---

[3] Based on defendants' proposed findings of fact, Mitchell's responses and defendants' reply, the following facts appear to be material and undisputed, unless otherwise noted.  Mitchell purports to have filed her own proposed findings of fact (dkt. #106), but this rambling, unnumbered document does not comply with the court's procedures for filing proposed findings of fact and will generally be disregarded.  Moreover, as best of the court can tell, Mitchell's version of events described therein does not materially differ from Mitchell's responses to defendants' proposed findings.

[4] At the time Mitchell filed the lawsuit, she was incarcerated at the New Lisbon Correctional Institution, but was reincarcerated at the Dane County Jail at least once during the pendency of these proceedings.  The court understands that Mitchell is currently incarcerated at Dodge Correctional Institution.

[5] Defendants have identified defendant Daniel "Werkherse" as Daniel Werkheiser.  The caption has been amended accordingly.

Health's" recommendation, but also supported by Mitchell.  Mitchell was initially placed in the "front bunk row area" or "pod" so that she could be observed from the deputy station. Because other inmates "had a problem" with her feminine appearance, Mitchell was quickly moved from that pod.  Mitchell was then placed in the "3G special needs" pod, apparently based on a staff member's opinion that "it may be a better environment for [Mitchell] than the other pods."  Pod 3G was also a "front row bunk" where she could be observed by staff, although this placement left open the possibility that Mitchell would be considered for movement to general population if her space was needed for another inmate.

For three days after placement in pod 3G, some of the inmates taunted and threatened Mitchell.  The basis for this undisputed proposed finding of fact is Mitchell's deposition, in which she stated:

> A:  For like three days, they just was taunting me. They kept calling me faggot, and they was making threats at me. Because I was like brushing it off, they was getting mad because I wouldn't feed back into it. So I went to an officer in the morning, and I told him, I said, Could you please move me? I can't take it no more, they keep bothering me. So he moved me. He moved me over to another pod in the front bunk row. And when I got over there, it was a lot better for me. The guys kind of warmed up to me. You know, they didn't pretty much bother me.
>
> Q: Was that Sergeant Koehler you're talking about who moved you?
>
> A: No, another officer.
>
> Q: Okay. Go ahead.
>
> A: He moved me. He said he moved me to keep the peace. And I was thankful to him.

The report of these events entered onto the "Jail Event Summary Report" by officer Brian Grafton stated as follows:

> Inmate came up and stated he was having problems with inmates in his bunk row. Inmate stated a few inmates in his bunk row have been picking on him because he won't talk to them or interact with anyone in the pod. Inmate stated he was also threatened yesterday afternoon but could not give any other details pertaining to the incident or names.
>
> Inmate is in a special needs pod but according to Traci Roberts (classification) he can be moved to g-pop. . . .
>
> Inmate moved to keep the peace.

Mitchell was moved to another pod, 3I, where the inmates did not bother her. Three days later, on July 26, 2006, Mitchell was told that she would be moved back to pod 3G. An incident report created by Deputy Isaacson in connection with the jail disciplinary process stated that Koehler called Isaacson and "informed [him] Mitchell is a hermaphrodite and would be better suited for the G side." Mitchell objected to being moved, telling Deputy Isaacson that she had been bothered by the other inmates there. The deputy went back to double-check the order, then told Mitchell she was still being moved. Mitchell refused to go, saying that she would rather be placed in administrative confinement than go back. The deputy told Mitchell she was going to the "timeout room" for refusing the order to move. Mitchell said that she was not going to the timeout room, and asked to be sent back to the old jail.

Isaacson called for a movement team to extract Mitchell and "briefed" the team. Deputy Isaacson handcuffed Mitchell. (At her deposition, Mitchell stated that defendant Wilson "snapped" the handcuffs on her "really rough," causing soreness and a knot on her wrist. Deputy Isaacson's report, however, states that "Deputy Wilson assisted me in placing Mitchell in handcuffs. I checked for tightness and double locked the handcuffs." In his affidavit, defendant Wilson agrees with the report, stating that Isaacson was the officer who

8

put the handcuffs on Mitchell. In her response, Mitchell does not dispute defendants' account, now stating that because she was handcuffed behind her back, she could not see which deputy handcuffed her.) Mitchell was given pain medication and the knot went away after about three weeks. Mitchell occasionally feels soreness. (Mitchell now states that she suffered pain for a longer period of time and that the knot was a cyst, but to the extent her summary judgment responses contradict the testimony above from her deposition, they will be disregarded under the sham affidavit rule. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995) (party may not defeat summary judgment by submitting affidavit that contradicts his or her prior deposition testimony).) Mitchell was then moved to segregation without further incident.

Isaacson issued a report stating that Mitchell violated prison rules by not following staff directions, refusing housing re-assignment and having more linens than issued. Mitchell's "Jail Event Summary Report" shows an entry by Isaacson stating that she could "remain in Seg until [her] hearing or space is needed." Mitchell was found guilty (the summary report shows a "Melissa Zielke" as the staff member who made this entry) and was disciplined with two days in lock-down segregation for these violations. Mitchell was kept in segregation for two extra days while jail officials considered where to place her. (According to the "Jail Event Summary Report," Koehler was one of the officials involved in this decision.) Mitchell was provided with her hygiene items, legal materials and writing materials, and was allowed to use the shower and phone during this extra two-day period. (Mitchell attempts to dispute this but does not cite to evidence stating otherwise.)

On July 30, 2006, Mitchell was placed in administrative confinement on "7 West" as she had wanted.  (Mitchell purports to dispute this fact as well, but does not cite to evidence calling this finding into question.  Moreover, any contrary testimony she would now give also violates the sham affidavit rule.  In her previous deposition, Mitchell testified that she was placed on administrative confinement, as she had wanted.)

### C. Defendant Algiers

On November 19, 2009, Mitchell was placed in the "bullpen" while waiting to be booked into the Dane County Jail.  Mitchell had to wait a couple of hours to be booked, which upset her.  While waiting for her booking photo to be taken, Algiers allegedly stared at her.  Mitchell asked Algiers why he was staring, but he did not respond.  After asking Algiers again why he was staring, Mitchell told him it was rude to stare at people like that.  Algiers then told Mitchell that he was stopping the booking process and taking her to "male segregation."  Mitchell finished the booking process the next day with no problems.

A few days later, defendant Algiers was passing out mail to inmates while Mitchell was eating breakfast.  As Mitchell set down her tray and got up to get her mail, Algiers threw her mail on the floor.  (Defendants state that the response to Mitchell's grievance regarding this incident indicates that a sergeant reviewed the video footage of the incident and found that Algiers waited at Mitchell's cell for thirty seconds before "placing" her mail in the cell.  However, the grievance is inadmissible hearsay.  *Williams v. Blagojevich*, No. 06-cv-0772-mjr, 2010 WL 456761, at *5 n.4, (S.D. Ill. Feb. 4, 2010).)

### D. Defendants Johnson and Werkheiser

At one point during her time at the Dane County Jail, Mitchell was housed in the 7 West wing in the City-County Building.  Mitchell had requested housing in that wing because she felt safer there.  Mitchell wore a padded bra while at the Dane County Jail. Mitchell alleges that one time when she was wearing her padded bra, defendant Deputy Nathan Johnson walked past her cell and commented to defendant Deputy Werkheiser, "Look at the tits," and they laughed at Mitchell.  (Johnson denies that he said this, noting that Mitchell filed a grievance about defendant laughing at her, but did not mention this remark.  Johnson does admit that he laughed while working with Werkheiser, but he was not laughing "at or near" Mitchell.)  This is the only comment Johnson or Werkheiser are alleged to have made regarding Mitchell's gender.

In early February 2010, when Mitchell was in the shower, defendant Johnson told her to hurry up or he would take away her hour out of administrative confinement for the following day.  Inmates do not control the shower, and Mitchell was waiting for the water to turn off  to get dressed.  (Defendants dispute Mitchell's characterization of the events, but point only to their own inadmissable hearsay in response to her internal grievance about the incident.)  Mitchell was allowed her daily hour out of administrative segregation the following day.

Mitchell normally received graham crackers for lunch because she was on a low-sodium diet.  On March 8, 2010, an inmate worker gave her saltine crackers instead of graham crackers.  Mitchell spoke to the inmate worker about the crackers (the parties dispute

whether Mitchell was "giving the inmate worker a hard time").  Defendant Werkheiser came

over and saw that Mitchell had been given the wrong type of crackers.

The parties dispute what happened next.  Defendants assert that Werkheiser told

Mitchell that she was not allowed both types of crackers, that Mitchell "snapped, 'fine, take

these then'" handed back the saltines, and Werkheiser gave her the graham crackers.

Mitchell states that she asked for graham crackers, that Werkheiser "stuck his unsanitary

fingers into [her] lunch meal tray in a hostile, disrespectful, degrading, humiliating manner,"

and then walked away when Mitchell asked for a new tray.

Another inmate on the same wing of the Jail, Alphonso Randall, would engage in "gay

bashing" (which the court understands to mean verbal insults and threats).  Sometimes,

Mitchell would argue back with Randall.  In this wing, inmates were allowed out of their cells

only one hour a day.  At that time, Randall and Mitchell were not formally marked to be kept

separate.  One day in early March 2010 (the parties dispute whether it was March 5 or 6),

while Mitchell was out of her cell making a phone call, defendant Werkheiser let Randall out

so that he could go to a court proceeding.  Randall said something to Mitchell like, "I can get

you if I want to now," but he kept walking toward the visiting area.  Randall was under

observation by Werkheiser the whole time. (Mitchell purports to dispute this by stating that

Werkheiser was "present outside of the cell block in the . . . hallway," but does not directly

dispute the assertion that Werkheiser could observe Randall from that location.)

Ultimately, Randall did not physically attack Mitchell.  After Mitchell complained of

not getting along with Randall, Mitchell and Randall were marked to be kept separate.

Deputy Werkheiser believed that Mitchell was "an equal participant" in the altercations with Randall.

### E. Defendant Price

Mitchell filed multiple complaints against deputies while she was incarcerated at the Dane County Jail, and defendant Sergeant Pat Price was charged with investigating all of them.  In February and March 2010, Mitchell had to wait a month for a response to a complaint because Price was not in the office.  After Mitchell complained about the delay to the Office of Detention and Facilities at the Wisconsin Department of Corrections, Price apologized to Mitchell and said that her issues were difficult to handle.

Price did not find that any of Mitchell's complaints were substantiated (other than the complaint that Price had not handled a grievance within the proper timeframe).  Price did not say anything to Mitchell about her gender, other than to comment, "I'm aware that you live an alternative lifestyle."

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For any basis on which the nonmoving party bears the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. If the party fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Id.* at 323. On this basis, plaintiff Mitchell's proof falls short on almost all of her claims, and so with one exception, defendants are entitled to summary judgment.

## I.   Excessive Force

Mitchell was allowed to proceed on a claim that defendant Wilson used excessive force against her, injuring her wrist. Based on the summary judgment submissions, this alleged incident occurred on July 26, 2006, when a "movement team" came to move Mitchell from her cell assignment and Mitchell was handcuffed.

As an initial note, the parties have not definitely established whether Mitchell was a pretrial detainee or prisoner serving a sentence on that date. Generally, excessive force claims in the prison setting involve the Eighth Amendment, while such a claim by a pretrial detainee arises under the Fourteenth Amendment's due process guarantee. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989); *Dorsey v. St. Joseph Cnty. Jail Officials*, 98 F.3d 1527, 1528 (7th Cir. 1996). Since the standards governing excessive force claims under the Fourteenth and Eighth Amendments are roughly the same, *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996), the question of Mitchell's status does not materially alter the court's analysis

In determining whether an officer has used excessive force against a prisoner under the Eighth Amendment, the question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  The factors relevant to making this determination include:

- the need for the application of force;

- the relationship between the need and the amount of force that was used;

- the extent of injury inflicted;

- the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and

- any efforts made to temper the severity of a forceful response.

*Id*. at 321.  Under the Fourteenth Amendment, the question is whether defendant's actions amount to "a deliberate act intended to chastise or deter," or at least to "reckless disregard for [plaintiff's] rights." *Wilson*, 83 F.3d at 875 (citations omitted).

Regardless of which of these largely overlapping standards is applied, defendants are entitled to summary judgment on plaintiff's excessive force on two grounds.  First, Mitchell fails to show that Wilson was the person who handcuffed her tightly.  A defendant's liability under § 1983 must be based on that individual's *personal* involvement in the constitutional violation.  *See Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Mitchell initially claimed that Wilson applied the handcuffs, while defendants maintain that it was Deputy Isaacson.  Now, Mitchell states that she could not see who was applying the handcuffs.  Since Mitchell has acknowledged

15

having *no* personal knowledge of who applied the handcuffs, and offers no other witness or evidence implicating Wilson, defendants' version remains undisputed.

Second, even if Wilson applied the handcuffs, Mitchell fails to show that the application of handcuffs violated either the Eighth or Fourteenth Amendments.  Although the handcuffs may have been tight, there is nothing in the record supporting a finding Wilson deliberately made them so, or acted "maliciously and sadistically" or with "reckless disregard" for Mitchell's rights.  In addition, the minor nature of the injury -- some pain and a short-lived "knot" -- while not by itself dispositive of an excessive force claim, *see Wilkins v. Gaddy*, 559 U.S. 34, 39-40 (2010), suggests that the force used was not so significant as to evince the wanton infliction of harm, much less the "knowing willingness that it occur."  *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Outlaw v. Newkirk*, 259 F.3d 833, 840 (7th Cir. 2001) (minor injury "supports the conclusion that the incident was 'at most . . . a *de minimis* use of force not intended to cause pain or injury'").  Not every malevolent touch by a prison guard gives rise to a constitutional violation.  *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")).

## II.    Equal Protection

Although the issue has yet to be settled in this circuit, the parties agree that Mitchell's Fourteenth Amendment equal protection claims based on her transgender status receive heightened scrutiny, meaning that Mitchell must show that: (1) she has been intentionally treated differently from others who are similarly situated; and (2) there is a substantial

relationship between this difference and a sufficiently important government interest. *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2012) (collecting cases and holding that heightened scrutiny applies to transgendered plaintiff's equal protection claims).

The Seventh Circuit further explained the standard for equal protection claims as follows:

> The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Nabozny v. Podlesny*, 92 F.3d 446, 453–54 (7th Cir. 1996) (quoting *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982)).

Therefore, "[a] showing that the defendants were negligent will not suffice." *Nabozny*, 92 F.3d at 454. The requisite intent is that defendants "acted either intentionally or with deliberate indifference" toward Mitchell because of her transgender status. *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002) (quoting *Nabozny*, 92 F.3d at 454).

## A.     Defendant Price

Mitchell was allowed to bring an equal protection claim against Price for failing to investigate her complaints properly. In her brief in opposition to summary judgment, she argues that Price failed to respond to her grievances within the 10 days called for by prison policy. The only proposed finding of fact supporting this argument states that Mitchell had to wait a month for a response to a complaint because Price was not in the office. After

Mitchell complained about the delay, Price allegedly apologized to Mitchell and said that her issues were difficult to handle.

None of the proposed findings of fact support a finding that Price acted with the requisite discriminatory intent; at most, they show that Price failed to respond sooner because he was out of the office, rather than because he intended to hurt Mitchell due to her transgender status. Notably, Mitchell fails to show that other, non-transgendered prisoners were treated any better by Price. Mitchell attempts to argue that Price's delay violated administrative rules, but this is irrelevant to the equal protection calculus. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]he violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established.").

Mitchell also states in her brief that Price's ultimate response to her complaints came on March 11, 2010, when he brought her "in front of the other named defendants," who "stood by while Defendant Price vindictively, humiliati[ng]ly non-chalantly, blew off my numerous [complaints] . . . ." Mitchell does not, however, provide findings of fact detailing these events, so the court will not consider them. *See Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 361 (7th Cir. 1992) ("Argument is not evidence upon which to base a denial of summary judgment."). In any event, because Mitchell fails to set forth facts entitling her to a trial on her claim against Price, the court will grant defendants' motion for summary judgment on this claim.

## B.      Defendant Algiers

Mitchell was also allowed to proceed on an equal protection claim against defendant Algiers for throwing Mitchell's mail at her in a degrading manner.  Despite making this claim, however, Mitchell again fails to provide any evidence permitting a reasonable inference that Algiers intentionally discriminated against her because of her transgender status.  Instead, the parties' proposed findings of fact state that Algiers stared at Mitchell during the booking process, and a few days later threw her mail at the floor.  As with the equal protection claim against Price, Mitchell offers no proof that Algiers acted the way she did because of Mitchell's transgender status, nor that she treated other inmates better.  Moreover, Algiers' alleged actions are simply not of sufficient import to raise constitutional questions.  *See, e.g., Antoine v. Uchtman*, 275 F. App'x 539, 541 (7th Cir. 2008) ("the Constitution does not compel guards to address prisoners in a civil tone using polite language"); *Bell v. Duperrault*, 367 F.3d 703, 709 (7th Cir. 2004) ("downright rudeness" not sufficient to support "class of one" equal protection claim); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) ("Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws.").

## C.      Defendants Johnson and Werkheiser

Mitchell states that:  (1) defendant Johnson said "look at the tits" while Mitchell was wearing a padded bra; (2) Johnson and defendant Werkheiser laughed at her; (3) Johnson threatened to take away Mitchell's free time for delaying in the shower; (4) Werkheiser stuck his fingers into her lunch; and (5) Werkheiser allowed a dangerous inmate to threaten her.

Unlike Mitchell's allegations against Price and Algiers, allegations that Johnson said "look at the tits" and that Johnson and Werkheiser laughed at Mitchell appear to be related to Mitchell's transgender status, or so a reasonable trier of fact might infer. Even if true, verbal harassment, even mocking her transgender status, does not violate the Constitution in and of itself. *DeWalt*, 224 F.3d at 612. ("The use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution.") However contemptible such behavior may be, therefore, it cannot support an equal protection claim.

Mitchell also alleges that defendant Johnson threatened to take away Mitchell's free time for delaying in the shower. This claim, too, must also be dismissed since Mitchell presents no evidence suggesting that she was treated differently than other inmates who are thought to have spent more than their allotted time in the shower. There is also no indication that Mitchell was, in fact, punished. Similarly, while defendant Werkheiser's alleged misconduct involving sticking his fingers into her food tray after she asked for graham crackers is boorish and thoroughly unprofessional, it does not rise to a Constitutional violation without more.

Finally, Mitchell alleges that Werkheiser left her alone with an abusive inmate. As an initial matter, this assertion is a misleading characterization of the proposed factual findings. The other inmate was let out of his cell only for purposes of being transported to a court hearing, so there is no reason to believe that he was in the common area for anything other than a brief time. Also, the undisputed facts indicate that Werkheiser observed this process from outside the cell block, and only after that threat were Mitchell and the other inmate marked for separation. In short, there is no evidence in the record that would support a

finding that Werkheiser was cavalier with respect to Mitchell's safety, nor that he acted the way he did because of Mitchell's transgender status.  In fact, there is no evidence to support a finding that Werkheiser diverged from what he would normally do under standard prison protocol.  Thus, summary judgment must also be granted to Werkheiser regarding this equal protection claim.

### D.    Defendant Wilson

The court next allowed Mitchell leave to proceed on an equal protection claim against defendant Wilson for forcibly removing her from pod 3I.  On the record on summary judgment, however, this court has already concluded (as noted above) that Mitchell failed to show Wilson was the person who handcuffed her tightly.  This dooms Mitchell's equal protection claim against Wilson because she must produce evidence of Wilson's *personal* involvement in the deprivation of Mitchell's rights.  The incident report shows that Wilson likely knew of Koehler's "hermaphrodite" classification of Mitchell, but there is no indication that the force used on Mitchell was different than what officers would have used otherwise.  Absent evidence supporting this finding, or at least allowing for a reasonable inference of discriminatory intent, Mitchell's claim cannot proceed.

### E.    Defendant Koehler

In the court's screening order, Mitchell was allowed to proceed on one last equal protection claim for being "placed in segregation by defendant Koehler, who falsely classified [her] as a hermaphrodite."  (Dkt. #14, at 2-3.)  After summary judgment briefing, the parties agree that there are actually three components to this claim: Koehler (1) labeled her as a

"hermaphrodite," (2) ordered her to be moved back to cell 3G, even though she had been taunted there, and (3) ordered her placed in segregation after she resisted the transfer and then kept her there longer than necessary.

Regarding the "hermaphrodite" classification, defendants argue that the term is technically accurate. Even assuming that defendants are incorrect, however, this mislabeling is at most akin to instances of racially derogatory language, which the court has already held do not violate the Constitution. *See DeWalt*, 224 F.3d at 612.

Mitchell's next claim regarding Koehler's decision to transfer Mitchell from 3I, where she states that the inmates did not bother her, back to pod 3G, where she states that she had encountered taunts and threats. On the face of it, the decision to move Mitchell *back* to 3G and likely taunts, rather than keep her in the pod in which she seemed to be accepted by the other inmates, is puzzling.

Defendants counter that "[d]irecting her to be moved back to the 'special needs cell,' 3G, could not be discrimination as Sergeant Koehler was treating Mitchell the same way as other inmates with special circumstances." This makes some sense regarding Mitchell's original assignment to pod 3G, but by the time Koehler ordered her back to 3G, he was not operating on a clean slate. Mitchell had already encountered problems in 3G. Plus, the various efforts made by staff to find a suitable place for Mitchell permits an inference that staff would generally attempt to move inmates away from taunting and threats.[6] To the extent that the decision to place Mitchell back in 3G was a departure from that practice, or at

---

[6] Surely defendants do not mean to argue that it is a common practice to consciously move vulnerable or special needs prisoners into cells where they will face a higher level of taunts or threats.

22

least counterintuitive, the trier of fact might reasonably infer that Mitchell was treated differently from other similarly-situated prisoners.

As noted above, for Mitchell's claim to withstand summary judgment, she must also show that there is a genuine issue of material fact as to whether Koehler "acted either intentionally or with deliberate indifference" to her complaints of harassment because of her transgender status. *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002) (quoting *Nabozny*, 92 F.3d at 454). The extent of Koehler's knowledge about Mitchell's problems is unclear. Defendants argue that "there is no evidence to suggest that Sergeant Koehler knew of any such risk when ordering Mitchell to be moved back to the special needs cell." Neither side has offered any testimony indicating that Koehler knew about the problems.[7]

Even so, the trier of fact might reasonably infer that Koehler, as the staff member making decisions about an inmate known to have special needs because of her transgender status, would have seen the "Jail Event Summary Report," which discusses the various problems Mitchell had in different cell assignments. For example, the report on Mitchell's stay in 3G states that she complained about inmates "picking on [her] because [s]he won't talk to them or interact with anyone in the pod" and that she "was threatened yesterday afternoon but could not give any other details pertaining to the incident or names," along with a note that a classification staff member said that she could be moved to general

---

[7] Defendants also point out that Mitchell's admission that she did not meet Koehler until *after* he made the decision to move her back to 3G, but whether they met is irrelevant because it is undisputed that he was aware of her transgender status, at least insofar as he characterized her as a "hermaprodite."

population, and the conclusion that she was moved "to keep the peace."   In contrast, the summary report contains *no* entries noting Mitchell complaining about harassment in 3I.

Based on the facts adduced by the parties, there appear to be material issues of disputed fact.  For example, it can be reasonably inferred from the summary reports and other evidence in this case that Koehler knew Mitchell was faring much better in 3I than she had in 3G, yet he ordered her moved back to 3G anyway for no good reason.  Defendants try to frame this claim as amounting to a claim regarding Mitchell's "right to a safe environment," something akin to an Eighth Amendment conditions of confinement claim, in which there must be a substantial risk of serious harm.  *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 837, 114 (1994).  They then argue that the facts known to Koehler preclude a finding that he was aware Mitchell faced a serious risk at that time.[8]

However, this is an equal protection claim, not an Eighth Amendment claim.  The *magnitude* of the harm faced is generally not an element of the claim.  *Cannon v. Burkybile*, 2002 WL 448988 (N.D. Ill. Mar. 22, 2002) ("To the extent § 1983 contains a *de minimis* injury requirement, it is a very low threshold.") (citing *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 814 (7th Cir. 2001) (claim of race conscious seating of elementary school students for short duration, even if it had minimal effect, could not be dismissed as *de minimis*)).  Even in the absence of any showing of compensable damages, persons whose constitutional rights are violated may sue for vindication of those rights and obtain awards of nominal damages. *Carey v. Piphus*, 435 U.S. 247 (1978).

---

[8] The version of events contained in Mitchell's deposition is more detailed and inarguably worse -- that inmates "kept calling [her] faggot," and "making threats" -- but Mitchell has not shown that *Koehler* knew or should have known of these events.

This is distinct from the question of whether a defendant's *actions* are sufficiently significant to implicate the Constitution, as discussed above: while some *acts* simply do not rise to the level of a Constitutional violation, *see Antoine*, 275 F. App'x at 541; *Bell*, 367 F.3d at 709; *DeWalt*, 224 F.3d at 612, the same is not true of the *harm* that discriminatory acts might cause. Intentionally placing an inmate in a situation where she will be taunted or threatened for her transgender status, despite evidence suggesting the defendant knew there to be a better placement readily available, would seem sufficient to prove an equal protection violation, at least where the decision bears no relation to a sufficiently important government interest. Here, it may be reasonable to infer from the facts that Koehler moved Mitchell back into 3G in the face of a markedly better option, despite knowing that it was unsuitable for her "special needs" as a transgender prisoner. Accordingly, defendants' motion for summary judgment on this claim will be denied.

In contrast, Mitchell's transfer to segregation following her refusal to move to 3G does not violate Mitchell's right to equal protection on its face, as there is no evidence suggesting that other prisoners who break prison rules by resisting transfer evade discipline for those violations. In any event, there is no indication that defendant Koehler was personally responsible for disciplining Mitchell: Deputy Isaacson issued the disciplinary report, and another staff member appears to have made the guilty finding. That the act of transfer to segregation does not itself rise to a Constitutional violation is again not to rule its impacts could not be a harm reasonably foreseeable by Koehler in originally (and wrongfully) returning her to 3G, should the jury so find.

Finally, with regard to Mitchell's claim that she served two extra days in segregation, the evidence before the court suggests that Koehler played a role in that determination. Mitchell also cites to several cases to bolster her claim, such as *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987), in which the Seventh Circuit observed, "Whether a prisoner may be subjected to the restrictive and necessarily harsh conditions of administrative segregation, not resulting from his own misconduct, for such a long period of time is a very difficult question." *Id*. at 416.  Even so, the extra time Mitchell served in segregation -- two days -- is far from "a long period of time."  Moreover, the *stated* rationale for the extra segregation time was to give prison officials time to consider where best to place Mitchell given her transgender status and worries about abuse at the hands of other inmates, both of which bear a substantial relation to the obviously important government interest in keeping inmates safe.  This is particularly so where the evidence shows that: (1) Mitchell had already been the subject of mistreatment by other inmates; (2) prison officials tried to improve the conditions of her confinement from that ordinarily afforded in disciplinary segregation by allowing her hygiene items, legal materials and writing materials, and use of the shower and phone; and (3) officials ultimately gave her the assignment she wanted, in administrative confinement on "7 West."  In other words, defendants made the best of a difficult situation, and there is nothing in the record to permit a reasonable inference that the decision to keep her in segregation for two days was done for "the purpose of causing . . . adverse effects" on her because of her transgender status.  If anything, all of the evidence is to the contrary.

### III.    Defamation

Mitchell also claims that defendant Koehler defamed her by calling her a "hermaphrodite."  To prove a claim of defamation under Wisconsin law, a plaintiff must adduce evidence showing that an allegedly defamatory statement (1) was spoken to someone other than the person defamed, (2) is false, (3) is unprivileged, and (4) tends to harm the defamed person's reputation so as to lower her in the estimation of the community or to deter third persons from associating or dealing with her.  *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534; 563 N.W.2d 472, 477 (1997); *Hart v. Bennet*, 2003 WI App 231, ¶ 21; 267 Wis. 2d 919; 672 N.W.2d 306.

Defendants argue that summary judgment should be granted on this claim because Koehler's label of "hermaphrodite" is technically accurate.  Truth is a complete defense to a defamation claim.  *Ladd v. Uecker*, 2010 WI App 28, ¶ 8, 323 Wis. 2d 798, 780 N.W.2d 216.  They cite to a dictionary definition defining *hermaphrodite* as "[a] person or animal having both male and female sex organs *or other sexual characteristics*, either abnormally or (in the case of some organisms) as the natural condition," http://oxforddictionaries.com/definition/english/hermaphrodite (last visited February 27, 2014) (emphasis added), and to a Tenth Circuit case in support of this position.  *See Estate of Dimarco v. Wyoming Dept. of Corrections, Div. of Prisons*, 473 F.3d 1334, 1336 n.1 (10th Cir. 2007) (Prisoner "liv[ing] her life as a woman even though she was anatomically male" termed a hermaphrodite based on district court's defining hermaphrodite as person having "both male and female characteristics, including in varying degrees reproductive organs, secondary sexual characteristics, and sexual behavior") (interior quotations omitted).

The court is unwilling to adopt Koehler's truth defense.  As Mitchell points out (and supports, albeit with improperly authenticated documents appearing to come from a dictionary and a scientific encyclopedia), the common understanding of the term "hermaphrodite" is an organism with both male and female reproductive organs.

Even so, Mitchell fails to show that she was harmed by Koeler's statement, at least in a way recognized by the law of slander.  Koehler's allegedly defamatory statement falls under the rubric of "slander," because it is defamation by oral statement,[9] rather than by written statement, or "libel."  As such, Mitchell's claim is not actionable unless (1) the slander is "actionable per se" ; or (2) she proves "special damages."  *Freer v. M & I Marshall & Ilsley Corp.*, 2004 WI App 201, ¢ 9, 276 Wis. 2d 721 688 N.W.2d 756 (citing *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 459, 113 N.W.2d 135, 138-39 (1962)).  Mitchell's claim fails in both respects.

*First*, only certain types of slander are "actionable without proof of damages" because damages are "presumed from the character of the defamatory language." *Martin*, 15 Wis. 2d at 459, 113 N.W.2d at 139.  Such defamation, known as "slander per se," is limited to the following four circumstances: (1) "imputation of certain crimes" to the plaintiff; (2) "imputation . . . of a loathsome disease"; (3) "imputation . . .  of unchastity to a woman plaintiff"; or (4) "defamation affecting the plaintiff in his business, trade, profession, or office."[10] *Freer*, 2004 WI App 201, ¶ 11 (quoting *Martin*, 15 Wis. 2d at 459, 113 N.W.2d at

---

[9]  The only evidence of Koehler's alleged defamatory statement about Mitchell being a "hermaphrodite" is from Isaacson's report, in which Isaacson states that Koehler made the remark.

[10]  Although the wisdom of giving these four categories special status is questionable, it is the standard in Wisconsin and so it is the standard the court follows here.  *Freer*, 2004 WI App 201, ¶ 11 ("Whether, as the Concurrence/Dissent opines, these categories "make sense" in this era . . .

139) (internal quotations omitted); *see also* Restatement (Second) of Torts §§ 570-574 (1977) (section titled "Liability Without Proof of Special Harm—Slander" and following sections defining each of the four categories). However arcane some of these categories[11] have become, none apply to Mitchell.[12]

Of course, the court takes seriously Mitchell's claim that she was defamed by Koehler's statement. Despite the strides in acceptance that transgender and intersex persons have made in American society, it is unfortunately true that they have been unfairly stigmatized, and that someone publically labeled a hermaphrodite could, however unjustly, face a loss of reputation. Even so, disparaging persons who are transgender or intersex does not fit into the particular categories recognized by the Restatement and Wisconsin law. Indeed, one might hope that it will become no disparagement at all, just as the third per se category may fall away.

*Second*, Mitchell fails to show "special damages," also known as "special harm," which is the loss of something having economic or pecuniary value. Restatement (Second) of Torts § 575, cmt. b; *see also Martin*, 15 Wis. 2d at 459, 113 N.W.2d at 139. If special harm is shown,

---

they are universal in our jurisprudence.") (citing Restatement (Second) of Torts § 570).

[11] Mitchell cites to an 1846 Ohio case for the proposition that calling a woman a hermaphrodite is per se slander, *Malone v. Stewart*, 1846 WL 107 (Ohio Dec. 1846), but this court is not bound by Ohio law and, as noted above, the law in Wisconsin has developed around the four categories articulated in the Restatement.

[12] For example, it would be outright offensive to categorize hermaphroditism as a "disease." Indeed, the Restatement makes clear that the category is meant to cover "an existing venereal disease or other loathsome *and communicable* disease," and there is no dispute that hermaphroditism is not communicable. Restatement (Second) of Torts § 572 (emphasis added); *see also id.* cmts. b and c (suggesting that leprosy and typhoid would also be counted as "loathsome diseases").

damages for emotional disturbance, bodily harm and harm to reputation may also be recovered. Restatement (Second) of Torts § 575, cmt. c, § 623, cmt. a; *see also Martin*, 15 Wis. 2d at 459, 113 N.W.2d at 139 ("Having proven such special harm of a pecuniary nature resulting from the action of third persons affected by the slander, the plaintiff may also recover general compensatory damages . . . for damages to the invasion of his interest in his reputation and good name including his own injured feelings."). However, if a plaintiff cannot show special harm, the slander claim is not actionable and she may not recover for these other types of damages. *Id.*

Mitchell asserts that all of the above-mentioned abuse she has faced at the hands of prison staff (and concomitant emotional distress she has suffered) is related to Koehler's statement. This is a dubious assertion on its face because Mitchell fails to show how the staff members would have known about Koehler's statement and thus acted they way they did because of it.[13] In any case, because Mitchell does not show any type of pecuniary harm from the slander, her other damages are irrelevant under Wisconsin law for purposes of maintaining her slander claim.

## MOTION FOR RECRUITMENT OF COUNSEL

Finally, Mitchell has renewed her motion for appointment of counsel, dkt. #161, which the court has denied several times previously. First, Mitchell should be aware that civil litigants

---

[13] Defendant Wilson may have known about Kohler's statement, because he was "briefed" on Mitchell's situation by Isaacson before extracting her. As stated above, however, Mitchell does not have personal knowledge of who applied the handcuffs. Even if Mitchell knew that Wilson applied the handcuffs, it would be pure speculation that he did so harshly out of animus based on Koehler's statement.

have no constitutional or statutory right to the appointment of counsel. *E.g.*, *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013); *Luttrell v. Nickel*, 129 F.3d 933, 936 (7th Cir. 1997). The court may exercise its discretion in determining whether to recruit counsel *pro bono* to assist an eligible plaintiff who proceeds under the federal *in forma pauperis* statute. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent an indigent civil litigant *pro bono publico*."); *Luttrell*, 129 F.3d at 936. The court cannot, however, "appoint" counsel to represent an indigent civil litigant; it merely has the discretion to recruit a volunteer in an appropriate case. *Ray*, 706 F.3d at 867.

To date, Mitchell has represented herself relatively capably, and her efforts have at least been sufficient to survive summary judgment on her equal protection claim against defendant Koehler. Given Mitchell's inexperience and the relative difficulty she will have in showing at trial that Koehler intended to discriminate against her, however, the court nevertheless concludes that this case meets the criteria for recruiting volunteer counsel, particularly now that her case will proceed to trial. To that end, the court will grant Mitchell's request to recruit counsel to represent her through the end of this matter.[14]

Mitchell is advised that it may take time to locate an attorney who is willing to represent her on a *pro bono* basis. Once counsel has been recruited and a notice of appearance has been entered designating an attorney of record for Mitchell, the court will schedule a status conference in this case. Further proceedings in this case will remain stayed until that time.

---

[14] Mitchell should be aware that this means that counsel will assist her with the trial on her claim against defendant Koehler; the court does not intend at this late date to expand the case to include claims regarding later acts of discrimination Mitchell may believe occurred.

ORDER

IT IS ORDERED that

(1) Plaintiff Roy Mitchell's motions to reinstate David Mahoney and Wisconsin Mutual Insurance Company as defendants (dkt. #40, 56), are DENIED.

(2) Plaintiff's motion to amend her complaint (dkt. #81) is DENIED.

(3) Plaintiff's motion to sanction defendants under Fed. R. Civ. P. 11 (dkt. #115) is DENIED.

(4) Plaintiff's motion for temporary restraining order (dkt. #141) is DENIED.

(5) Plaintiff's motion to amend her request for relief (dkt. #149) is DENIED.

(6) Defendants' motion for summary judgment (dkt. #94) is GRANTED in all respects except plaintiff's equal protection claim regarding defendant Koehler's decision to transfer her back to the 3G pod.

(7) The request for recruitment of legal counsel by plaintiff (dkt. # 161) is GRANTED.

(8) Once counsel has been recruited and a notice of appearance has been entered designating an attorney of record for plaintiff, the court will schedule a status conference in this case.  Further proceedings in this case remain STAYED until such time.

Entered this 10th day of December, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

32